Macel MEDLEY, a child under the age of 18 years, who sues by her next friend, Nancy Barnhart, Executive Director, Kanawha-Putnam Association for Retarded Citizens, individually, and on behalf of all other persons similarly situated, Plaintiff,

Sophia Lynn Booker, a child under the age of 18 years, who sues by her next friend, Rev. Steward Frazier, Intervenor Plaintiff,

v.

Leon GINSBERG, Commissioner, West Virginia Department of Welfare, John E. Burdette, II, Area Administrator, Area 17, West Virginia Department of Welfare, William (Bill) Curry, Social Service Supervisor, Area 17, West Virginia Department of Welfare, Mark Hudnall, Caseworker, Area 17, West Virginia Department of Welfare, George Pickett, M.D., Director, West Virginia Department of Health, John Barnette, Executive Director, Shawnee Hills Community Mental Health/Mental Retardation Center, Inc., and Roy Truby, Superintendent of Schools, Defendants.

Civ. A. No. 78-2099 CH.

United States District Court,
S.D. West Virginia,
Charleston Division.

June 10, 1980.

E. Gail Falk, Tobias Hirshman, Appalachian Research & Defense Fund, Inc., Charleston, W. Va., for plaintiffs.

Chauncey H. Browning, Atty. Gen., of West Virginia, Richard L. Gottlieb, David R. Brissell, David P. Cleek, Asst. Attys. Gen., Michael A. Braun, Charleston, W. Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on defendants' motion for summary judgment. Defendants' motion challenges the court's subject matter jurisdiction and raises the question of whether the doctrines of abstention and exhaustion of administrative remedies are applicable to this civil action.

Plaintiff Macel Medley and intervenor-plaintiff Sophia Lynn Booker sue individually and on behalf of a class of mentally retarded children and young adults to redress the deprivation of federal constitutional and federal and state statutory rights alleged to have occurred incident to their institutionalization by the State of West Virginia, including the State's alleged failure to make adequate provision for their social and educational needs. The court has certified the following class pursuant to Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure:

> All persons under the age of twenty-three (23) years who suffer from mental retardation as that term is defined by W. Va. Code Ann. § 27–1–3 (1976), who are citizens of the State of West Virginia, who are unable to live in their homes due to lack of resources in their homes or in their home communities to fulfill their special needs arising from their mental retardation, and who are now or will in the future be institutionalized by reason of the failure of the named defendants, or their successors in office, to provide foster homes or other community facilities which can provide the required resources.[1]

Plaintiffs seek injunctive relief enjoining defendants from maintaining plaintiffs in an institution or state hospital in lieu of providing plaintiffs with appropriate education, treatment and care, and services in a foster home or other community-based facility in their home communities. The named plaintiff and the intervenor plaintiff each seek $20,000.00 in damages and their costs. Plaintiffs also seek declaratory relief declaring that defendants, who are officials of the West Virginia Department of Welfare, the West Virginia Department of Health, the West Virginia Department of Education and the Shawnee Hills Community Mental Health and Mental Retardation Center, Inc., have violated various federal constitutional rights, federal statutory rights and state statutory rights of plaintiffs. The declaratory relief so sought pertains to educational, medical and custodial care and various other services alleged to be required to be provided to mentally retarded persons under the age of twenty-three years.

The rights of the mentally retarded have only recently become a subject of focused legislative and judicial concern. Consequently, the defendants' motion for summary judgment calls upon the court to explore a relatively undefined aspect of federal jurisdiction.

Plaintiffs' statutory and constitutional claims are presented to a significant extent in the context of four federal statutes.[2] The Developmentally Disabled Assistance and Bill of Rights Act (hereinafter, DDA-

---

1. This class is subdivided into two subclasses:
   (1) All members of the class who are less than eighteen (18) years of age;
   (2) All members of the class who are age eighteen (18) years or more but less than twenty-three (23) years of age.

2. Jurisdiction is invoked pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1343, 28 U.S.C. § 1331, 28 U.S.C. § 794, and 28 U.S.C. §§ 2201-2.

BRA), 42 U.S.C. §§ 6001–6081, establishes federal grants for participating states to provide services for persons with developmental disabilities and enacts a bill of rights which enumerates minimum objectives and standards for the treatment and habilitation of developmentally disabled persons. *See United States v. Solomon*, 563 F.2d 1121 (4th Cir. 1977). The Education for All Handicapped Children Act (hereinafter, EHCA), 20 U.S.C. §§ 1401–1461, provides federal funds for participating states to ensure an appropriate education for each handicapped child and to guarantee each child and her or his parents procedural due process administrative safeguards. The Rehabilitation Act of 1973, 29 U.S.C. §§ 701–794, establishes a comprehensive program for the provision of vocational services to the handicapped. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, proscribes discrimination against handicapped persons in programs which receive federal financial assistance. *See Hairston v. Drosick*, 423 F.Supp. 180, 184 (S.D.W.Va.1976). The Community Mental Health Center Act (hereinafter, CMHCA), 42 U.S.C. §§ 2689–2689aa, provides federal funds for the establishment and maintenance of community mental health centers in participating states.

In addition to the alleged deprivation of rights afforded by these four federal acts, plaintiffs allege that they have been denied rights created by the First, Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution, as well as chapters sixteen, twenty-seven and forty-nine of the West Virginia Code.

## I. Subject Matter Jurisdiction

In determining whether this court is vested with subject matter jurisdiction, it would appear that each of the following three theories merit consideration.

First, whether plaintiffs are afforded a private cause of action by implication for violations of the four federal statutes, pursuant to the analysis established in

*Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), with jurisdiction predicated upon 28 U.S.C. § 1331 or 28 U.S.C. § 1343.

Second, whether plaintiffs may maintain a suit for the deprivations of the rights conferred by each of the four federal statutes pursuant to the remedy created by 42 U.S.C. § 1983,[3] with jurisdiction afforded either by its jurisdictional counterpart, 28 U.S.C. § 1343,[4] or by 28 U.S.C. § 1331.

Third, assuming it is found that section 1983 provides a remedy for deprivations of the rights afforded by each of the four federal statutes, whether the court may maintain jurisdiction over the claims arising under those statutes as federal claims pendent to plaintiffs' constitutional claims pursuant to the rationale of *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974), with jurisdiction over plaintiffs' constitutional claims being predicated upon 28 U.S.C. § 1331 or 28 U.S.C. § 1343.

## A.

■ The first theory, based on the *Cort v. Ash* analysis, would require the examination of each of the four federal statutes just noted to determine whether Congress intended a private cause of action, even though not expressed, to exist for violation of each such statute. *See, e. g., Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). This theory arises from "the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). For the reasons expressed in the discussion which follows, plaintiffs have stated a cause of action pursuant to section 1983 with respect to the federal statutory claims alleged and jurisdiction is afforded by section 1343. Thus, although this first

---

3. Hereinafter referred to as Section 1983.

4. Hereinafter referred to as Section 1343.

theory is potentially applicable to the case at bar,[5] it is not considered further.

### B.

Turning to the second and third theories noted, the court must first determine whether, as contended by defendants, the United States Supreme Court's decision in *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), precludes plaintiffs from stating a claim for violation of the United States Constitution and the four federal statutes under section 1983 with jurisdiction predicated upon section 1343. In *Chapman*, the Court addressed the question previously reserved in *Hagans v. Lavine*, 415 U.S. 528, 533–34 n.5, 94 S.Ct. 1372, 1377–78 n.5 (1974), as to whether that portion of section 1343(3),[6] which provides federal jurisdiction over actions to redress the deprivation under color of state law "of any right, privilege or immunity secured by the Constitution," should be construed as excluding supremacy clause claims. The supremacy clause states in pertinent part:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the Supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S.Const. art. VI, § 2. At issue in *Chapman* was the variance of a state welfare regulation with the Social Security Act's Aid for Families With Dependent Children provisions.

By a plurality of its members, the Court held that the supremacy clause does not provide a right secured by the Constitution in the nature of "equal rights" or "civil rights" as those terms are used in section 1343(3) and (4). In addition, the court held that section 1983 merely creates a remedy which, taken alone, does not secure "equal rights" or "civil rights" as used in section 1343(3) and (4). Thus, in order to premise a section 1983 cause of action on section 1343(3) and (4) jurisdiction, the alleged deprivation must involve a right secured by the Constitution or a federal statute which satisfies either the "equal rights" or "civil rights" criteria. The Court concluded that the statutory rights created by the Social Security Act do not, on there own, or couched in terms of the supremacy clause, satisfy the section 1343(3) and (4) "equal rights" and "civil rights" criteria.

*Chapman* did not resolve the related question of whether section 1983 provides a cause of action for the deprivation of statutory rights which do not fall within the ambit of the section 1343(3) and (4) "equal rights" and "civil rights" criteria, irrespective of its holding that section 1343(3) and (4) does not provide jurisdiction for such deprivations. Four members of the Court stated that the term "laws" as used in section 1983 encompasses all federal stat-

---

5. *See Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84 (3rd Cir. 1979) (implied private cause of action under DDABRA); *Naughton v. Bevilacqua*, 458 F.Supp. 610 (D.R. I.1978) (implied private cause of action under DDABRA), *aff'd* 605 F.2d 586 (1st Cir. 1979); *Armstrong v. Kline*, 476 F.Supp. 583 (E.D.Pa. 1979) (implied private cause of action under EHCA); *Davis v. Southeastern Community College*, 574 F.2d 1158 (4th Cir. 1978) (implied private cause of action under section 504 of the Rehabilitation Act), *rev'd on other grounds*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *see generally* Steinberg, *Implied Private Rights of Action under Federal Law*, 55 Notre Dame Law. 33 (1979).

6. Sections 1343(3) and (4) provide:

> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
>
> (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

28 U.S.C. § 1343(3) and (4).

utes.[7] Three members of the Court believed that section 1983 encompasses only those rights secured by statutes providing for "equal rights" and "civil rights" and is, therefore, coextensive with section 1343(3) and (4).[8] Two members of the Court subscribed only to the plurality opinion which did not express a position on the issue. *See Tongol v. Usery*, 601 F.2d 1091, 1098 (9th Cir. 1979).

The decision of *Blue v. Craig*, 505 F.2d 830 (4th Cir. 1974), presents the position of the United States Court of Appeals for the Fourth Circuit on this question. The plaintiffs in *Blue* were recipients of medical assistance under the North Carolina Medical Assistance Program which was established by the State of North Carolina in order to receive federal funds as provided by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396k. Plaintiffs alleged that defendants, who were state officials, deprived them of rights secured by Title XIX of the Social Security Act in that the North Carolina program did not provide medical assistance recipients transportation to and from medical services or reimbursement for transportation costs as required by federal regulations promulgated pursuant to Title XIX. The district court dismissed the action, reasoning that plaintiffs failed to state a claim because section 1983 provides a cause of action only for constitutional deprivations.

The Court of Appeals reversed the decision of the district court and held that an allegation of the deprivation of rights provided through Title XIX of the Social Security Act stated a cause of action under section 1983. In so doing, the court embraced the following language from the decision of the United States Court of Appeals for the Fifth Circuit in *Gomez v. Florida State Employment Service*, 417 F.2d 569, 579 (5th Cir. 1969):

> "[I]t is true that § 1983 has quite often been used as a means of protecting *Constitutionally* guaranteed rights, particularly in the area of equal protection of the Negro. But the language of this civil rights statute is broad: it is a violation of the statute to transgress '*any* rights, privileges, or immunities secured by the Constitution and *laws*' of the United States. (Court's italics) * * * Moreover, the Supreme Court in *Peacock v. City of Greenwood*, 1964, 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944, clearly indicated that § 1983 was applicable when statutory, as well as, constitutional 'rights, privileges and immunities' were involved."

505 F.2d 835–36 [emphasis in original]. Thus, the import of *Blue* is that section 1983 is to be literally construed to the end that a federal statute conferring a right, privilege or immunity is deemed to give rise to a cause of action under section 1983 if that section's other requirements are also satisfied.[9] *See also Tongol v. Usery*, 601 F.2d 1091 (9th Cir. 1979); *Chase v. McMasters*, 573 F.2d 1011 (8th Cir. 1978), *cert. denied*, 439 U.S. 965, 99 S.Ct. 453, 58 L.Ed.2d 423 (1978); Note, *The Propriety of Granting a Federal Hearing for Statutorily Based Actions Under the Reconstruction-Era Civil Rights Act: Blue v. Craig*, 43 Geo.Wash.L.Rev. 1343 (1975).

■ Based upon the foregoing circuit authority, a litigant can state a cause of action pursuant to section 1983 for the deprivation of a right conferred by a federal

---

7. *Chapman v. Houston Welfare Rights Organization, supra* (White, J., concurring; Stewart, J., dissenting).

8. *Chapman v. Houston Welfare Rights Organization, supra* (Powell, J., concurring).

9. The court also cited the following excerpt from Judge Learned Hand's opinion in *Bomar v. Keyes*, 162 F.2d 136, 138–39 (2d Cir. 1947), *cert. denied*, 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400 (1947), *reh. denied*, 332 U.S. 845, 68 S.Ct. 266, 92 L.Ed. 416 (1947):

> " * * * Although the books are full of cases under that statute concerning deprivation of rights and privileges, secured by the Constitution, we have been unable to find any in which the right or privilege at stake was secured by a 'law' of the United States. Nevertheless the language is so plain that the only question is whether this particular 'law' secured to the plaintiff a 'privilege.' "
> 505 F.2d at 835.

statute which does not satisfy the requirements of section 1983's jurisdictional counterpart, section 1343. If an individual alleges the deprivation of a right conferred by the Constitution or a federal statute which confers "equal" or "civil" rights, the individual may, in addition to stating a claim under section 1983, premise jurisdiction on section 1343(3) or (4).[10] With these principles in mind, the court turns to the jurisdictional foundation of the case at bar.

## C.

As alleged in the amended complaint, plaintiffs' constitutional claims are twofold:

### COUNT 10

50. Plaintiff's institutionalization is neither genuinely voluntary nor is it necessary or even appropriate to her care, treatment and education.

51. By their acts and omissions defendants have deprived plaintiff and other members of her class of liberty, privacy and dignity, and equal opportunities without due process of law and have deprived them of the equal protection of

the laws in violation of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution.

### COUNT 11

52. Plaintiff was confined solely on account of her "status" as a mentally retarded juvenile.

53. By their acts and omissions defendants and their class have confined plaintiff and other members of her class solely by reason of her status in violation of the Eighth Amendment to the United States Constitution.

Plaintiffs' constitutional claims emanate from the burgeoning body of decisional law which has begun to address the constitutional implications of the states' education and institutionalization of the mentally and physically handicapped. In recent years, several courts have recognized or alluded to the right to treatment or habilitation in the least restrictive setting pursuant to the due process clause, and the right to receive equal educational and social opportunities appropriate to one's needs pursuant to the equal protection clause.[11] To a degree, this body of case law recognizes the mentally

---

10. To the extent that *Blue* also held that section 1343(3) "is to be given as broad and extensive an application as § 1983 itself," 505 F.2d at 839, it is superceded by the Supreme Court's holding to the contrary in *Chapman*.

11. *See, e. g., O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975) ("[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends"); *Wyatt v. Aderholt*, 503 F.2d 1305 (5th Cir. 1974) (Persons civilly committed to state mental institutions have a right to treatment); *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295 (E.D.Pa.1977) (Voluntarily and involuntarily committed retarded persons have a right to be provided with minimally adequate habilitation), *aff'd* 612 F.2d 84 (3rd Cir. 1979) (*en banc*); *Mills v. Board of Education*, 348 F.Supp. 866 (D.D.C.1972) (Failure to provide mentally retarded children a free public education constitutes a denial of equal protection); *Panitch v. State of Wisconsin*, 444 F.Supp. 320, 322 (E.D.Wis.1977) (Failure to provide mentally retarded children an appropriate public education constitutes a denial of

equal protection); *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 343 F.Supp. 279 (E.D.Pa.1972); *Lora v. Board of Education of City of New York*, 456 F.Supp. 1211, 1275–76 (E.D.N.Y.1978) (Emotionally handicapped students might be characterized as a "suspect" class"); *Fialkowski v. Shapp*, 405 F.Supp. 946, 958–59 (E.D.Pa.1975) (Retarded children might be a "suspect class"); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 466 F.Supp. 487, 504 (E.D.N.Y.1979) (Segregation of mentally retarded children who carried hepatitis B, but not hepatitis B carriers who are not retarded, is without a rational basis), *aff'd* 612 F.2d 644 (2d Cir. 1979); *Welsch v. Likins*, 373 F.Supp. 487, 491–500 (D.Minn.1974), *aff'd in part and vacated and remanded in part*, 550 F.2d 1122 (8th Cir. 1977); *New York Ass'n for Retarded Children, Inc. v. Rockefeller*, 357 F.Supp. 752, 762–65 (E.D.N.Y.1973) (Mentally retarded persons are not a "suspect class," but nonetheless have a right to be free from harm pursuant to the Eighth and Fourteenth Amendments). *See also* President's Committee on Mental Retardation, *The Mentally Retarded Citizen and the Law* at 172–213, 384–441 (1976).

retarded as a class of citizens who are relatively powerless in the political process as that trait was first identified for purposes of equal protection analysis by Justice Stone in *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n.4, 58 S.Ct. 778, 783–84 n.4, 82 L.Ed. 1234 (1938). It also reflects a recognition that the "failure to provide adequate habilitation may well mean commitment for the life of the retarded individual." *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295, 1315 (E.D.Pa.1977); *aff'd* 612 F.2d 84 (3rd Cir. 1979) (*en banc*).

The present posture of the case at bar does not permit the court to fully explore or pass upon the constitutional claims presented. Nevertheless, admitted facts concerning the institutionalization of plaintiff Medley compel the conclusion that significant constitutional claims have been raised.[12] It is admitted that plaintiff Medley is a seventeen year old mentally retarded girl whose institutionalization in a state hospital is not genuinely voluntary. It further appears from admitted allegations that the continued long-term institutionalization of plaintiff Medley is inappropriate and that she remains institutionalized because there are no foster homes or other residential community placements for mentally retarded adolescents who cannot be cared for in their home.

■ The factual basis for these admitted allegations, as well as the outstanding disputed questions of fact,[13] require further development in order that the court may fully comprehend and ultimately pass upon the merits of the constitutional issues presented. The court is, nevertheless, able to conclude that at the very minimum plaintiffs have presented colorable constitutional claims. It follows that plaintiffs' constitutional claims cannot be characterized as "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court or otherwise completely devoid of merit as not to involve a federal controversy within the jurisdiction of the District Court, whatever may be the ultimate resolution of federal issues on the merits." *Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974), *citing Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–67, 94 S.Ct. 772, 776–77, 39 L.Ed.2d 73 (1974). Having alleged constitutional deprivations which "deal with the concept of 'equality' or with the guarantee of 'civil rights,' as those terms are commonly understood," and which are also within the ambit of section 1983, jurisdiction to consider those deprivations is conferred by section 1343(3).[14] Accordingly, the court is of the opinion that defendants' motion for summary judgment with respect to plaintiffs' constitutional claims should be denied.

### D.

The court turns next to the jurisdictional basis, if any, for the alleged federal statutory deprivations. In *Hagans v. Lavine, supra*, the Supreme Court held that if section 1343 jurisdiction exists over federal constitutional claims alleged pursuant to section 1983, jurisdiction over pendent federal statutory claims may be maintained without establishing an independent jurisdictional basis.[15] Since the Supreme Court's decision

---

**12.** *See* Amended Complaint at paragraphs 3, 10–26, 43 and 50; Answer at paragraphs 3, 10–26, 43 and 50.

**13.** *See especially* Amended Complaint at paragraphs 39, 41, 49 and 50; Answer at paragraphs 39, 41, 49 and 50.

**14.** 441 U.S. at 621, 99 S.Ct. at 1917. Defendants' motion and memorandum in support thereof indicate that defendants have not thus far challenged plaintiffs' allegation of state action.

**15.** In *Hagans*, the Court stated:
Concededly, § 1343 authorizes a civil action to "redress the deprivation, under color of any State . . . regulation . . . of any right . . . secured by the Constitution of the United States." Section 1343(3) therefore conferred jurisdiction upon the District Court to entertain the constitutional claim if it was of sufficient substance to support federal jurisdiction. If it was, it is also clear that the District Court could hear as a matter of pendent jurisdiction the claim of conflict between federal and state law, without determining that the latter claim in its

in *Chapman v. Houston Welfare Rights Organization, supra*, three circuit courts of appeals have reaffirmed the holding in *Hagans. See Shands v. Tull*, 602 F.2d 1156 (3rd Cir. 1979); *Holley v. Lavine*, 605 F.2d 638 (2nd Cir. 1979); *Tongol v. Usery*, 601 F.2d 1091 (9th Cir. 1979).[16] In addition, in *Kimble v. Solomon*, 599 F.2d 599 (4th Cir. 1979), *cert. denied*, 100 S.Ct. 422 (1979), the United States Court of Appeals for the Fourth Circuit stated in dictum:

Relying on our decision in *Blue v. Craig*, 505 F.2d 830 (4th Cir. 1974), the district court determined that it had jurisdiction under 28 U.S.C. § 1343(3), without regard to the amount in controversy, over a claim that state officials are administering a Social Security program in violation of federal regulations. Since the district court's decision, however, the Supreme Court has held in *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), that the jurisdictional grant of § 1343(3) does not encompass a claim that a state welfare regulation is invalid because it conflicts with the Social Security Act.

As an alternative basis for jurisdiction, the district court determined that it had jurisdiction under § 1343(3) over plaintiffs' constitutional due process claim and then asserted pendent jurisdiction over the claim of violation of the federal notice regulations. This procedure was approved by the Supreme Court in *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Although plaintiffs' constitutional claim was ultimately rejected by the district court, its discussion of the issue demonstrated that the claim was not "frivolous or so insubstantial as to be beyond the jurisdiction of the District Court," *id.* at 539, 94 S.Ct. at 1380. *See also Mothers' & Children's Rights Organization v. Sterrett*, 467 F.2d 797 (7 Cir. 1972).

599 F.2d at 602 n.2.[17]

In the case at bar, plaintiffs' federal statutory claims do not focus upon the incongruity of a state statute or regulation with its federal counterpart, but instead question the legitimacy of the state's institutionalization of plaintiffs by defendants in light of the four federal statutes relied upon.

■ With the decision of *Blue v. Craig, supra*, in mind, there is little difficulty in

own right was encompassed within § 1343. *Rosado v. Wyman*, 397 U.S. 397, 402–405, 90 S.Ct. 1207, 1212–1214, 25 L.Ed.2d 442 (1970); see also *N. Y. Dept. of Social Services v. Dublino*, 413 U.S. 405, 412 n. 11, 93 S.Ct. 2507, 2512 n. 11, 37 L.Ed.2d 688 (1973). 415 U.S. at 536, 94 S.Ct. at 1378. Having found petitioners' equal protection challenge to defendant's social security regulation "substantial" in terms of the considerations drawn in *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the Court concluded that "[g]iven a constitutional question over which the District Court has jurisdiction, it also has jurisdiction over the 'statutory' claim. . . . The latter was to be decided first and the former not reached if the statutory claim was dispositive." 415 U.S. at 543, 94 S.Ct. at 1382.

**16.** *See also Gilchrist v. Califano*, 473 F.Supp. 1102, 1105 (S.D.N.Y.1979). In *Chapman*, Justice White noted in his concurring opinion that the parties could maintain their action, notwithstanding the Court's decision, if they could state a nonfrivolous constitutional claim:

The Court does not question the continuing validity of *Hagans*. Indeed, the Court's remand in No. 77–719 leaves open the opportunity for respondents to seek to amend their

complaint to allege, if they can, a nonfrivolous constitutional claim. Their statutory claim, on which suit is authorized by § 1983, would then qualify as a pendent claim within the jurisdiction of the District Court, as both *Rosado* and *Hagans* recognize.

*Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 661 n. 33, 99 S.Ct. 1905, 1938, 60 L.Ed.2d 508 (1979) (White, J., concurring).

For decisions utilizing the *Hagans* doctrine prior to *Chapman, see, e. g., Vickers v. Quern*, 578 F.2d 685 (7th Cir. 1978); *Greklek v. Toia*, 565 F.2d 1259 (2nd Cir. 1977), *cert. denied*, *Blum v. Toomey*, 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978); *Williams v. Wohlgemuth*, 540 F.2d 163 (3rd Cir. 1976).

**17.** *Kimble* involved a challenge to the State of Maryland's across-the-board reduction in Medicaid benefits in violation of federal regulations requiring notice to affected recipients. Inasmuch as the issue on appeal was what relief plaintiffs were entitled to, the court did not have occasion to address the *Hagans* principle further.

concluding that section 1983 provides a remedy for the deprivation of federal statutory rights created by DDABRA, EHCA and section 504 of the Rehabilitation Act.[18] In addition to providing entitlements somewhat similar in nature to the medical assistance benefits provided by Title XIX of the Social Security Act at issue in *Blue*, the three statutes afford rights which are cast as civil rights personal to the beneficiaries under those statutes and which, by design, are intended to promote the equal treatment of and equal opportunity for the beneficiaries. Less easily resolved is whether CMHCA affords plaintiffs "a right, privilege or immunity" secured by a federal statute.

■ Plaintiffs' alleged cause of action under CMHCA is that community mental health centers located in West Virginia have failed to provide plaintiff and members of the plaintiff class services required by CMHCA, 42 U.S.C. § 2689(b)(1), and that such failure has resulted in the inappropriate institutionalization of plaintiff and members of the plaintiff class. Taken as a whole, CMHCA is best characterized as a federal grant-in-aid statute. It is nevertheless implicit in the substantive predicates to funding contained in CMHCA that its purpose is to effectuate the recently recognized principle that community based mental health care is preferable to institutionalized care. *See, e. g.*, 42 U.S.C. § 2689e(c)(1). In this sense, CMHCA embodies a congressional commitment to the principle of treatment or habilitation in the least restrictive setting. *See* S.Rep. No. 94–29, 94th Cong., 1st Sess. 66–78, [1975] U.S.Code Cong. & Admin.News, pp. 528–41. The ultimate beneficiaries of CMHCA are, therefore, those persons, such as plaintiffs, who are afforded improved mental health services in their community with concomitantly reduced restraint on their liberty. *Cf. Blue v. Craig, supra; Caramico v. Secretary of Dep't of Housing and Urban Development,* 509 F.2d

694, 700 (2d Cir. 1974). Accordingly, the court is satisfied that plaintiffs may state a claim for the alleged failure of defendants to comply with CMHCA pursuant to section 1983 inasmuch as they are the "individuals most directly affected by the administration of [the] program." *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970).

■ A corollary to the question of whether plaintiffs may state a claim for violations of CHMCA is whether plaintiffs have the requisite standing to assert the claim. Standing analysis is a two-fold inquiry:

> First, whether the plaintiff[s] . . . allege "injury in fact," that is, a sufficiently concrete interest in the outcome of their suit to make it a case or controversy subject to a federal court's Art. III jurisdiction, and, second, whether, as a prudential matter, the plaintiff[s] . . . are proper proponents of the particular legal rights on which they base their suit.

*Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *see also National Union of Hospital & Health Care Employees, RWDSU, AFL–CIO v. Carey,* 557 F.2d 278 (2d Cir. 1976).

■ Plaintiffs contend that defendants' noncompliance with CMHCA results in the unavailability of services required by CMHCA, and further, the inappropriate institutionalization of plaintiff and members of the plaintiff class. As alleged, plaintiffs' injury is concrete and it can be fairly traced to the State of West Virginia's alleged noncompliance with CMHCA in the provision of community mental health services to its citizens. It is manifest that should plaintiffs prevail on their CMHCA claim, the relief granted would flow directly to their benefit. Thus, plaintiffs are proper proponents of a claim alleging violation of CMHCA and have the requisite standing to prosecute such a claim.[19]

---

18. *See* note 5, *supra*; see also New York State Ass'n for Retarded Children, Inc. v. Carey, *466 F.Supp. 487, 490 (E.D.N.Y.1979).*

19. Defendants' motion for summary judgment generally asserts that plaintiffs lack the requisite standing to maintain this civil action. As developed in defendants' memorandum of law, however, the standing issue is presented as

■ For the foregoing reasons, the court concludes that plaintiffs may state a claim based upon section 1983 for defendants' alleged noncompliance with the provisions of the four federal statutes in issue. Moreover, having determined that jurisdiction may be maintained over plaintiffs' constitutional claims, the court may consider plaintiffs' federal statutory claims as a matter of pendent jurisdiction. Further, the court has considered the factors enunciated in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), counselling the exercise of pendent jurisdiction over state claims. Having reviewed plaintiffs' state claims,[20] the court is of the opinion that the factors enunciated in *Gibbs* militate in favor of the court's maintenance of pendent jurisdiction over those claims as well.

## II. Exhaustion of Administrative Remedies

Defendants raise the doctrine of exhaustion of administrative remedies as a further barrier to plaintiffs' maintenance of this civil action. Defendants contend that federal and state administrative remedies are available to plaintiffs under the federal statutes raised by plaintiffs. The court will, therefore, consider the exhaustion doctrine in the context of each of the four federal statutes in issue.

### A. DDABRA

■ Defendants contend that plaintiffs must exhaust the administrative remedy created by section 6012 of DDABRA. Section 6012 provides in pertinent part that:

In order for a State to receive an allotment under subchapter III of this chapter, (1) the State must have in effect a system to protect and advocate the rights of persons with developmental disabilities, (2) such system must have the authority to pursue legal, administrative, and other appropriate remedies to insure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State . .

42 U.S.C. § 6012(a). It is apparent from a facial reading of this provision that it does not purport to create an administrative remedy. Instead, it requires states to establish an advocacy agency to pursue the rights of the developmentally disabled as a condition precedent to the receipt of federal funds under DDABRA. *See Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84, 97 (3rd Cir. 1979).[21] Thus, section 6012(a) does not provide an administrative remedy of a nature which invokes the exhaustion requirement.

### B. Section 504 of the Rehabilitation Act

■ Defendants contend that plaintiffs must exhaust administrative remedies promulgated by the Department of Health, Education and Welfare (hereinafter, HEW), pursuant to section 504. 29 U.S.C. § 794.

The regulations relied on by defendants, which are found at 45 C.F.R. §§ 80.6 to 80.10 (1979), were originally promulgated to effectuate section 601 of the Civil Rights Act of 1964. 42 U.S.C. § 2000d.[22] Pursuant

---

whether plaintiffs have stated a claim or cause of action upon which relief may be granted. Inasmuch as the court does not perceive, and defendants have not asserted, any basis for concluding that plaintiffs have not incurred an injury in fact and are not within the zone of interests protected by the constitutional provisions and statutes in issue, the issue of plaintiffs' standing is not considered further.

**20.** Amended Complaint at paragraphs 36–45.

**21.** In West Virginia, the West Virginia Advocates for the Developmentally Disabled, Inc., a private non-profit corporation, was designated as the agency which implements section 6012(a) pursuant to Executive Order No. 6–77

issued by Governor John D. Rockefeller, IV, on September 12, 1977. Plaintiffs' attorney, Gail Falk, is affiliated with the West Virginia Advocates for the Developmentally Disabled. *See also United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979); S. Conf. Rep. No. 94–473, 94th Cong., 1st Sess. at 42, [1975] U.S.Code Cong. & Admin.News at p. 961.

**22.** Section 601 provides:
No person in the United States shall, on the ground of race, color, or national origin, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.
42 U.S.C. § 2000d.

to 45 C.F.R. § 84.61 (1979), the regulations are incorporated by reference and made applicable to the regulations which implement section 504. They are, in essence, an enforcement scheme by which the Secretary of HEW may, upon finding a state in noncompliance with section 504, require compliance with section 504 by either informal means or by the termination of federal funding.

In *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the United States Supreme Court held that a private cause of action may be maintained for violations of Title IX of the Civil Rights Act of 1964. 20 U.S.C. §§ 1681–1686. The Court expressly rejected the contention that individuals must pursue the administrative procedures for the termination of federal funding of institutions in violation of Title IX in lieu of or as a condition precedent to a private cause of action. The court observed:

> Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.
>
> The first purpose is generally served by the statutory procedure for the termination of federal financial support for institutions engaged in discriminatory practices. That remedy is, however, severe and often may not provide an appropriate means of accomplishing the second purpose if merely an isolated violation has occurred. In that situation, the violation might be remedied more efficiently by an order requiring an institution to accept an applicant who had been improperly excluded. Moreover, in that kind of situation it makes little sense to impose on an individual, whose only interest is in obtaining a benefit for herself, or on HEW, the burden of demonstrating that an institution's practices are so pervasively discriminatory that a complete cutoff of federal funding is appropriate. The award of individual relief to a private litigant who has prosecuted her own suit is not only sensible but is fully consistent with—and in some cases even necessary to—the orderly enforcement of the statute.

441 U.S. at 704–06, 99 S.Ct. at 1961–1962 [footnotes omitted].

Section 504, like Title IX, was modeled upon and closely tracks Title VI of the Civil Rights Act of 1964.[23] *See Trageser v. Libbie Rehabilitation Center, Inc.*, 590 F.2d 87, 88 (4th Cir. 1978), *cert. denied*, 442 U.S. 947, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1979). Thus, *Cannon*'s treatment of administrative enforcement as a remedy complementary to and independent of private civil actions is equally applicable to section 504. This conclusion is supported by the fact that HEW's administrative enforcement scheme for Title VI violations has been adopted for HEW's administration of section 504. *See* 45 C.F.R. § 84.61 (1979). For these reasons, the United States Courts of Appeals for the Third and Fifth Circuits have held that *Cannon*'s reasoning applies to section 504 and that recourse to HEW's administrative enforcement scheme is not a prerequisite to maintenance of a private cause of action. *See N.A.A.C.P. v. Medical Center, Inc.*, 599 F.2d 1247 (3rd Cir. 1979); *Camenisch v.*

---

**23.** Section 504 provides in pertinent part:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. Title IX provides in pertinent part:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 1681(a).

*University of Texas*, 616 F.2d 127 (5th Cir. 1980). The Fifth Circuit explained in *Camenisch, supra*, that:

It is clear why the Supreme Court reached the result it did in *Cannon*. The administrative enforcement process, established by Congress as a part of Title VI, centers entirely on the question of whether, in light of the policies and practices of a recipient of federal assistance, federal funds should continue to flow to that recipient. It is predicated upon the need by the Secretary to monitor and enforce the nondiscrimination provisions of agreements between HEW and the recipients of federal assistance. *See* 45 C.F.R. §§ 80.8–80.9 (1979). The purpose of the administrative framework is to provide a forum in which to initiate fund termination proceedings in the event a grant recipient fails to meet its obligations. It is not intended to provide a forum for program beneficiaries to press claims of discrimination against grant recipients. *See* 45 C.F.R. §§ 80.8(a), 80.-10(f) (1979).

The remedy that emerges from such a hearing process is not designed to aid petitioners like Camenisch at all. A decision to terminate funding of a noncomplying recipient could work to the disadvantage of a complainant like Camenisch since such a cutoff could guarantee that no further services accrue to the complaining party. There is no specific vindication of personal rights within the HEW administrative procedure for complaining parties like Camenisch.

*Id.* [Footnote omitted]. *See also Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970); *Whitaker v. Board of Higher Education of City of New York*, 461 F.Supp. 99, 107–08 (E.D.N.Y. 1978); *Larry P. v. Riles*, No. C–71–2270 at 52–57 (N.D.Cal. Oct. 16, 1979).[24]

Title IX, Title VI and section 504 share a common design and purpose. The court is therefore of the opinion that based upon the reasons of policy and practicality expressed in *Cannon*, plaintiffs need not attempt to invoke HEW's administrative enforcement scheme as a condition precedent to this action.

### C. CMHCA

▄▄ Defendants contend that sections 2689s and 2689t of CMHCA provide a further administrative avenue of relief for plaintiffs. Those sections, however, do not purport to create or require participating states to create administrative remedies for individuals. Instead, they prescribe the scope of regulations to be promulgated by HEW in order to implement CMHCA and the content of state plans which must be submitted by states seeking funds pursuant to CMHCA. A review of HEW's regulations governing grants for community mental health centers, 42 C.F.R. §§ 54.101 to 54.110 (1979), further establishes that there is no available administrative remedy by which plaintiffs may seek administrative relief. Instead, in contrast to HEW's regulations which implement Title IX, Title VI and section 504, there is no express provision in the applicable regulations permitting citizen initiation of HEW administrative review. There are, therefore, no administrative remedies under CMHCA which need to be exhausted by plaintiffs.

### D. EHCA and State Administrative Remedies

▄▄ Of the four federal statutes in issue, only EHCA provides administrative remedies which by design would be efficacious with respect to plaintiffs' claims. Under section 1415 of EHCA, due process procedures are afforded to "parents or guardians of a handicapped child, or, whenever the parent or guardian is unknown, unavail-

---

**24.** The court notes parenthetically that 45 C.F.R. § 84.36 imposes procedural safeguards on public elementary and secondary education programs in the "identification, evaluation or educational placement of" handicapped persons pursuant to section 504. The section, however, permits affected programs to satisfy its requirement by complying with the procedural safeguards of section 1415 of EHCA. The administrative remedies made available through section 1415 of EHCA are discussed *infra* at 1307–1309.

able, or the child is a ward of a state, a surrogate appointed by procedures established by the State" to participate in the formulation of an "individualized education plan" for the child and to review its implementation. Inasmuch as section 1415 requires participating states to develop and implement the due process procedures, the administrative remedy available to plaintiffs under EHCA is a state administrative remedy, notwithstanding its federal origins. West Virginia's due process procedures are found in Article VII of the West Virginia Department of Education's *Annual Program Plan Amendment for Part B of the Education of the Handicapped Act as amended by Public Law 94–142.*

The effect of state administrative remedies upon civil actions brought pursuant to section 1983 is addressed in *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975) (*en banc*), *cert. granted,* 423 U.S. 923, 96 S.Ct. 264, 46 L.Ed.2d 249 (1975), *cert. dismissed,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976). In *McCray,* the defendants, Maryland prison officials, asserted that plaintiff, an inmate, must exhaust his state administrative remedy established by the Maryland Inmate Grievance Commission Act, 4A Ann.Code of Md., Art. 41, § 204F (1973 Cum.Supp.), before he could maintain a section 1983 action. After addressing the exhausting doctrine's generally broad application, the Court of Appeals synthesized the body of United States Supreme Court decisions on the question[25] and stated:

> From this survey of the pertinent authorities, the law would appear overwhelming that exhaustion of available state administrative remedies is not a prerequisite to maintaining a § 1983 action in a federal court.

516 F.2d at 363. The court thereafter concluded that:

> On balance, therefore, we have repeated expressions by the Supreme Court

that exhaustion is not required in cases like the instant ones, and only an indirect expression that exhaustion may be required in certain cases unlike the instant ones. In this state of the law, it is inappropriate to consider the policy considerations which might dictate a different course of decision. They must be addressed to the Supreme Court, which alone can overrule its prior decisions, or to the Congress, which has authority to amend the statute. Our duty is clear: We must follow the Supreme Court, not attempt to lead it. We must hold that exhaustion is not required.

516 F.2d at 364–65.

The "indirect expression" adverted to in *McCray* is found in *Gibson v. Berryhill,* 411 U.S. 564, 574–75, 93 S.Ct. 1689, 1695–96, 36 L.Ed.2d 488 (1973), where the Court intimated that exhaustion of state administrative remedies may be required in instances where there was a pending state administrative proceeding at the time the section 1983 action was instituted and the plaintiff would not be deprived of rights until the completion of the administrative proceeding. Such an exception is not applicable to the case at bar.

The court observes that persuasive arguments have been urged for requiring the exhaustion of state administrative remedies in the setting of section 1983 actions. *See McCray v. Burrell,* 516 F.2d 357, 375–77 (4th Cir. 1975) (Widener, J., concurring and dissenting).[26] Nevertheless, continued adherence to the holding of the majority in *McCray* in subsequent decisions suggests that it retains its precedential weight. *See Davis v. Southeastern Community College,* 574 F.2d 1158, 1160 n. 4 (4th Cir. 1978), *rev'd on other grounds,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Strader v. Troy,* 571 F.2d 1263, 1269 (4th Cir. 1978); *see also Sanders v. McCrady,* 537 F.2d 1199,

---

25. *See McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Damico v. California,* 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

26. *See also* Staff, *Developments in the Law— Section 1983 and Federalism,* 90 Harv.L.Rev. 1264–74 (1977).

1200–01 (4th Cir. 1976). *Sanders, supra,* cites with approval the rationale for not requiring the exhaustion of administrative remedies which is expressed in an article published at 60 Va.L.Rev. 250 (1974). The author states therein:

> The rationale for refusing to require exhaustion of state administrative remedies is that the federal courts have less stake in promoting resort to state agencies than in protecting constitutional liberties. When state rather than federal agencies are involved, the powerful separation of power doctrine is not called into play. The policies of federalism are not strong in this context as they are in the context of abstention for the pursuit of state judicial remedies.

McCormack, *Federalism and Section 1983: Limitations on Judicial Enforcement of Constitutional Claims, Part II,* 60 Va.L.Rev. 250, 276 (1974).

Even if the exhaustion of state administrative remedies were held to be of utility in section 1983 actions, it is doubtful whether it would be applicable to plaintiffs' claim based upon EHCA. Admitted facts before the court suggest that, contrary to state regulations, neither a parent nor guardian was present, nor was a surrogate parent appointed, who could have taken advantage of the due process procedures promulgated by the West Virginia Department of Education pursuant to EHCA on behalf of plaintiff Medley.[27] *See* Amended Complaint at paragraphs 3, 10 and 26; Answer at paragraphs 3, 10 and 26. The record before the court further indicates that, in fact, no one did take advantage of the due process procedures established for the protection of individuals such as plaintiff Medley.[28]

Secondly, the application of the exhaustion doctrine in the present case must be considered in light of the class nature of this litigation. The legislative history of EHCA indicates that the administrative remedies provided in section 1415 were not designed to be of utility in every instance. Senator Harrison Williams, a principal sponsor of EHCA in the Senate, made the following statement during Senate floor debate on the Act:

> Mr. President, with regard to complaints, I want to underscore that exhaustion of the administrative procedure established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter. Nor is it intended that the availability of these administrative procedures be construed so as to require each member of the class to exhaust such procedures in any class action brought to redress an alleged violation of the statute.

121 Cong.Rec. 37,416 (1975). *See also Armstrong v. Kline,* 476 F.Supp. 583, 602 (E.D. Pa.1979).

Having considered the precedent by which this court must be guided, and having further considered the nature of the state administrative remedy established pursuant to EHCA, the court is of the opinion that the exhaustion doctrine as it relates to EHCA is not applicable to plaintiffs' claims.

### III. Abstention

The court turns briefly to defendants' contentions regarding abstention. Defendants assert that the doctrine of abstention announced in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and developed most recently in *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), militates in favor of this court's abstention from the consideration of plaintiffs' claims. The *Younger* doctrine requires, in essence, that a federal court abstain from enjoining or otherwise interfering with a pending state proceeding when the considerations of equity, comity and federalism so warrant. There were,

---

**27.** W.Va.Dept. of Ed., *Annual Program Plan Amendment for Part B of the Education of the Handicapped Act as amended by Public Law 94 142* at 24- 34 (FY 1979) (Art. VII "Procedural Safeguards").

**28.** *Compare Loughran v. Flanders,* 470 F.Supp. 110 (D.Conn.1979), *with Harris v. Campbell,* 472 F.Supp. 51 (E.D.Va.1979).

**1310**

however, no state judicial or administrative proceedings pending at the time this action was initiated. The *Younger* abstention doctrine is, therefore, inapplicable. Further, defendants have not raised and the court does not perceive any of the factors which give rise to the policy of abstention enunciated in *Pullman v. Texas Railroad Commission*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), present in the case at bar. Accordingly, abstention is not warranted.

### IV.

For the reasons stated in this memorandum order, the court is of the opinion, and so hereby ORDERS, that defendants' motion for summary judgment should be, and accordingly is, denied.

The Clerk is directed to forward certified copies of this order to all counsel of record herein.